FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 FEB 27 PM 1:04

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHIRLEY JUANITA WARD,       )
                           )
     Plaintiff,            )        CIVIL ACTION NO.
                           )
v.                         )        CV-95-AR-3187-S
                           )
SHELBY COUNTY, ALABAMA, et. )
al.,                       )
                           )        **ENTERED**
     Defendants.          )

FEB 27 1997

### MEMORANDUM OPINION

The court has before it defendants' motion for summary

judgment. For the reasons stated below the motion is due to be

granted and plaintiff's action is due to be dismissed.

### A. Pertinent Facts

On April 15, 1995, Charles Ward ("deceased") left his home in

an agitated and distraught state. He was apparently upset about an

extra-marital affair in which his wife, plaintiff in the present

action, Shirley Juanita Ward ("Ward"), had engaged and which he

believed was ongoing. Deceased left his home with a .38 caliber

revolver and a cellular phone.  He had been drinking and had

numerous bottles of the beer in the car when the police eventually

found him.  His toxicology report, made after his death, showed

that deceased had a blood alcohol level of .212.    Deceased

1

contacted plaintiff via the cellular phone and discussed his distress and possible suicidal intentions. These phone conversations continued on and off, during the entire relevant period. Deceased also spoke intermittently with his brother in Arkansas who attempted to console deceased.

Plaintiff, obviously concerned, called a 911 operator in order to find help for her husband whom she believed, was possibly suicidal. The 911 operator, Keith McCoy ("McCoy"), subsequently, called deceased on his cellular phone. This call ended abruptly when deceased cursed at McCoy and hung-up the phone. Responding to a bulletin concerning deceased, sheriff's deputies Tracey Lawley ("Lawley") and Stan Chapman ("Chapman") looked for and eventually found deceased sitting in his car on a logging road near plaintiff's home. Lawley and Chapman did not initially approach the vehicle but rather observed it and its occupant from a distance with binoculars. Shortly after finding deceased, Deputy Dennis Chamblee ("Chamblee") and Sergeant Jim Walters ("Walters")[1] arrived on the scene.

The exact sequence of the following events is unclear.

---

[1] Walters is apparently a 15 year veteran of the Shelby County Sheriff's Department with an associate degree in criminal justice. He had apparently received training in handling emotionally disturbed individuals, and on the proper allocation of force in given situations. He has also allegedly attended seminars relating to psychiatric crisis response.

Chamblee contacted plaintiff via cellular phone.   Plaintiff told Chamblee that she had been in contact with deceased and that deceased was upset that plaintiff had called the police and that he had threatened to kill himself if the police came near him.   It is unclear whether he threatened to shoot the officers at that time. Viewing the evidence in the light most favorable to plaintiff the court determines that he did not. Either prior to or after this, plaintiff's last conversation with Chamblee, deceased shot out the window of his car and apparently said to plaintiff, "[t]hat's three bullets down, and I've got two left."[2]   Viewing the evidence in the light most favorable to plaintiff, the court determines that plaintiff spoke with Chamblee after deceased shot out the window.

After hearing shots, the officers, who had heretofore kept their distance from the vehicle, ran down the logging road on which deceased's car was parked.   They were allegedly concerned that deceased had shot himself.   Upon approaching the car they noticed that there was someone moving inside the car. It was at this point that the officers discovered deceased had not shot himself but had

---

[2]Plaintiff asserts in her deposition that deceased, after shooting out his car window, "dropped his gun."   There is no evidence to support this. She was on the phone with her husband and did not see him release the weapon. She offers no explanation as to how or why she believed this to be true. Furthermore, even if he did put his weapon down at some point, there is no evidence that he did not pick up the gun when he later exited the vehicle. In fact the evidence shows that he had indeed, if he ever put it down, picked up the gun.

3

instead shot his car window.   Officers saw deceased sitting in the
car, talking on the phone and drinking a beer.   Deceased at some
point was throwing beer bottles and shards of glass out the window.
The officers took position, off the road, around deceased's car.
Walter's position was closest to the vehicle.   The position offered
him only limited cover due to the small size of the trees behind
which he stood.

       During this time deceased was on the phone with her husband.
She implored him to come home.   He told her that he needed to
urinate and that he would thereafter return.      At this point,
deceased opened the car door and exited the car.   Plaintiff, on her
cellular phone, though she had no further direct communications
with deceased, heard the car door open, heard the ringing that the
car makes when keys are left in the ignition, and allegedly heard
"a difference from the inside of the car to the outside of the
car."   Plaintiff alleges that this hearing "a difference from the
inside of the car to the outside of the car" indicates deceased had
the phone in his hand after he exited the car. Plaintiff admits she
could not see whether deceased indeed had the phone in his hand,
nor did she converse with him after he left the car.   Indeed, as
described below, the phone was found in the car after the shooting.

After deceased exited the vehicle he put a beer bottle on the top his car. Walters, believing he was insufficiently covered, stepped out on the road after deceased turned to face him. Walters, who was in his uniform, had his gun drawn and pointed at deceased.   Walters told deceased to let Walters see deceased's hands.   Walters thereafter noticed the gun in deceased's hand. Walters several times ordered deceased to drop his gun. Plaintiff, on the other end of the phone and Kay Towers ("Towers") who was listening to the conversation on her shortwave radio, did not hear anyone telling deceased to drop his gun.  Walters then saw deceased cock his pistol,[3] raise the gun and point it toward Walters. Still ordering him to put down the gun, Walters, apparently fearing for his life, shot deceased. Other deputies then approached deceased and secured the gun, which was cocked in deceased's hand. Thereafter, deputies applied CPR and called paramedics.   Deceased died at the scene.

Plaintiff heard the gunshots on her cellular phone and became hysterical and began crying into the phone.    Chapman allegedly found the phone still inside the car, heard the crying, turned off the phone, and placed it onto the seat of the car. Immediately

---

[3]The gun was found by investigators in the cocked position.

5

after the shooting the Alabama Bureau of Investigation and the Alabama Department of Forensics were called.  Shortly thereafter, they arrived and investigated the incident. It does not appear as if any action adverse to defendants has occurred as a result of said investigation.

### B. Summary Judgment Standard

Rule 56 states, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F. R. Civ. P. 56(c).  As stated by the Eleventh Circuit, "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994).

### C. Legal Analysis

### 1. Unreasonable Seizure

The case at bar turns almost entirely on whether deceased was carrying a gun when he was shot by Walters.  Plaintiff concedes as

6

much.[4]  The court determines that the evidence overwhelming shows
that plaintiff did indeed have a gun in his hand at the time of the
shooting and that Walters reasonably believed his life was in peril
when he shot deceased.  Plaintiff's assertion that deceased had a
cellular telephone in his possession when he was shot, which is
dubious at best, does not alter this conclusion. Accordingly,
Walters is entitled to summary judgment as a matter of law.  While
it is true that summary judgment, on either substantive or
qualified immunity grounds, in excessive force cases should not be
granted where there is a factual dispute, it is well settled that
the disputed fact must be material. *See Hilaire v. Laconia*, 71 F.3d

---

[4]Plaintiff's brief attempts, without supporting evidence, to have this court
engage in a hypothetical journey that would lead to a conclusion that defendants
participated in one of the most egregious abuses of police power imaginable.

> Plaintiffs submit that this court has been presented with two
> scenarios, one in which Mr. Ward had a gun in his hand and one in
> which he did not.  The defendants insist that only the first scenario
> happened or could have happened.  However, if plaintiffs' version of
> the facts are to be assumed as being correct, then the defendants'
> version is not to be believed, then what happened once the
> investigators arrived is even more frightening.  The defendants lied
> to the ABI, they tampered with evidence by moving the pistol from the
> car, cocking it, and placing it outside the car, and placing the phone
> back in the car.  Thus, the alleged reasonableness of defendants'
> actions are, at best, not to be believed.

(Plaintiff's Response Brief at 12-13).  The court is unwilling to embark on such a
journey.  While construing evidence in a light most favorable to plaintiff, and
concluding that the phone was in the deceased's hand at the time of the shooting,
the court still cannot allow the case to go forward.  This is the only evidence
offered to prove elaborate scheme of deceit.  Indeed, if Walters reasonably
believed that his life was in peril, and reasonably mistook the phone for a gun,
there would be no reason to cover up the shooting.

20, 25 (1st Cir. 1995), *cert. denied*, __U.S.__, 116 S. Ct. 2548 (1996). Here the dispute is not material. There is no direct evidence to show that deceased did not have a gun in his hand at the time of the shooting. The fact that deceased was not carrying a gun is mere speculation that would require an unreasonable logical leap by a fact-finder that this court cannot now, and would not on a similar Rule 50 F.R.Civ.P. motion, permit. "As such, [the evidence that deceased may have had a phone in his hand is] by [itself] insufficient to create a genuine dispute as to whether [Walters] reasonably believed he had to use deadly force against [deceased] to defend himself." *Hilaire v. City of Laconia*, 885 F. Supp. 349, 357 (D.N.H. 1995). Therefore, the only questions remaining are those of law for this court to decide.

Defendants initially argue for summary judgment, relating to plaintiff's § 1983 claims, on two separate grounds. First, they argue that the shooting of deceased was not an excessive use of force under the Fourth Amendment. Second they argue that they are entitled to qualified immunity for the shooting. The inquiry into both questions is, "as a practical matter", essentially the same. *See Wilson v. Meeks,* 52 F.3d 1547, 1552 (10th Cir. 1995)("The question of qualified immunity dovetails almost precisely with the

8

substantive inquiry in a section 1983 action"); *Diaz v. Salazar*, 924 F. Supp. 1088, 1093 (D.N.M. 1996) ("[I]n excessive force cases the substantive inquiry that decides whether the force exerted by police was so excessive that it violated the Fourth Amendment is the same inquiry that decides whether the qualified immunity defense is available to the government actor"). *But see Oliveria v. Mayer,* 23 F.3d 642, 648-49 (2d Cir. 1994), *cert. denied,* __U.S.__, 115 S. Ct. 721 (1995) and *cert. denied,* __U.S.__, 115 S. Ct. 722 (1995). Nevertheless, this court's decision is premised solely on the failure of plaintiff to show a Fourth Amendment violation. Therefore, this court does not explicitly reach the qualified immunity question. *See Menuel v. City of Atlanta*, 25 F.3d 990, 997 (11th Cir. 1994) ("[T]he absence of an underlying Fourth Amendment violation supersedes the issues of qualified immunity and municipal liability . . . .").

Because there is no evidence showing that deceased did not have a gun at the time of the shooting, and because plaintiff argues this as the only reason that Walters' conduct violated the Fourth Amendment, a full rehashing of the Fourth Amendment seizure jurisprudence does not appear to be necessary. Nevertheless, this court will address the relevant case law in the interest of

thoroughness, and because the court is aware that "the award of summary judgment to the defense in deadly force cases [should be] made only with particular care where the officer defendant is the only [eye]witness left alive to testify." *Plakas v. Drinski,* 19 F.3d 1143, 1147 (7th Cir. 1994), *cert. denied* __U.S.__, 115 S. Ct. 81 (1995).

A section 1983 analysis "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989). This case arises under the Fourth Amendment protection against unreasonable seizures, applied to the states through the Fourteenth Amendment. The "seizure" in the present case occurred at the instant deceased was shot. *See Menuel,* 25 F.3d at 995 (citing *California v. Hodari D.,* 499 U.S. 621, 111 S. Ct. 1547)(1991)). The question then becomes whether the seizure was objectively reasonable under the circumstances of the individual situation. *See Graham,* 490 U.S. at 396-97, 109 S. Ct. at 1871-72.

> " . . . [T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d. 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is
actively resisting arrest or attempting to evade arrest
by flight. *See Tennessee v. Garner,* 471 U.S., at 8-9, 105
S. Ct., at 1699-1700 . . . .

The "reasonableness" of a particular use of force must be
judged from the perspective of a reasonable officer on
the scene, rather than with 20/20 vision of hindsight.

\*\*\*

The calculus of reasonableness must embody allowance for
the fact that police officers are often forced to make
split-second judgments--in circumstances that are tense,
uncertain, and rapidly evolving--about the amount of
force that is necessary in a particular situation.

\*\*\*

[T]he "reasonableness" inquiry in an excessive force case
is an objective one: the question is whether the
officers' actions are "objectively reasonable" in light
of the facts and circumstances confronting them, without
regard to their underlying intent or motivation.

*Id*. at 396-97, 109 S. Ct. at 1872.   In the present case all of the

relevant evidence points to the fact that Walters' shooting

deceased was reasonable under the circumstances.   The officers were

acutely aware, through phone conversations with plaintiff, that

deceased was in an agitated state and that he had claimed he would

shoot himself if the officers approached.   Nevertheless, the

officers reasonably approached deceased's position after they heard

deceased fire his gun.   The officers waited under some cover for a

time until deceased exited his vehicle, realizing he had little

physical protection, given the nature of his surroundings, from someone who was obviously armed, Walters reasonably approached deceased. According to all relevant testimony, Walters told deceased to drop his weapon several times before Walters fired. Walters fired his weapon only in self-defense after deceased raised his gun and pointed it at Walters. Plaintiff has shown no animus of the officers--not that it is necessarily relevant, *see id.* at 397, 109 S. Ct. at 1872--nor has she shown evidence that the other officers are covering-up for Walters or any physical evidence that the gun or phone was moved by any of the officers at the scene. Indeed, the only evidence shows that Walters was acting out of concern for his own life and for those of his fellows.

"The officers proceeded slowly, cautiously, and precisely, resorting to deadly force only when assaulted with [apparent] deadly force." *Menuel*, 25 F.3d at 996. Even if deceased had not initially intended to fire at the officers, but had only left his vehicle to relieve himself, this only makes "his death particularly tragic." *Wilson*, 52 F.3d at 1553. All indications were, however, that deceased did indeed intend to fire his weapon at the officers.

Even if the officers could have taken some "better" course of action, this court will not second-guess a decision made in a life-

threatening situation.

> Other than random attacks, all such cases begin with the decision of a police officer to do something ,to help, to arrest, to inquire.   If the Officer had decided to do nothing, then no force would have been used.  In this sense, the police officer always causes the trouble.   But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Plakas*, 19 F.3d at 1150.  The officers here decided to try to help an obviously distressed person.  Unfortunately their efforts failed when deceased, not they, changed the scope and nature of confrontation.   An objectively reasonable person, indeed the plaintiff's own expert, would have reacted in a similar fashion had a gun been pointed at him.  Since plaintiff makes no showing that the gun was not pointed at Walters when he made his decision to shoot, defendants' motion for summary judgment on this issue is due to be granted.[5] The court notes that plaintiff's contentions that other steps may have been taken prior to the shooting are mere speculation and a second guessing of an obviously tense situation. After the officers heard the gunshot they were obligated to

---

[5]The court notes here that primary case upon which plaintiff relies, *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), *cert. denied* __U.S.__, 115 S. Ct. 735 (1995), is inapposite from the case at bar. *Alexander* addressed the constitutionality of a police entry into a building without an arrest warrant, but with an administrative warrant, whereafter the police shot and killed the building's occupant.

13

investigate whether deceased had harmed himself or others. Plaintiff's assertion that the officers, after shots were fired, could simply observe deceased as he existed his car and do nothing, when deceased's ultimate intentions were unknown and where the Walters had little cover should deceased have directly confronted him, is one with which this court cannot agree. As noted in *Plakas*, officers of law have an obligation to the community, to themselves, and to the persons whom they confront, to attempt to resolve often dangerous situations. *Id*. In the present action the officers engagement and subsequent actions were objectively reasonable.

As to the remaining deputy defendants, Chapman, Lawley and Chamblee, they did not "seize" the deceased in the constitutional sense, in that they did not shoot him. As noted above, a seizure, for Fourth Amendment purposes, does not occur in a case such as this until the plaintiff or deceased is shot. *See Menuel*, 25 F.3d at 995. Plaintiff must agree because she has not contested this issue. Accordingly, defendants motion for summary judgment, as to plaintiff's § 1983 claims against Walters, Chapman, Lawley and Chamblee, is, without serious discussion, due to be granted.

14

### 2. Shelby County

> A municipality, county, or other local government is a
> "person" that may be sued under § 1983 for constitutional
> violations caused by policies or customs made by its
> lawmakers or by "those whose edicts or acts may fairly be
> said to represent official policy."

*McMillian v. W.E. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996),

*cert. granted sub. nom., McMillian v. Monroe County, Ala.,*

__U.S.__, 117 S. Ct. 554 (1996)(citing *Monell v. New York City*

*Dept. of Social Services,* 436 U.S. 658, 98 S. Ct. 2018 (1978)).

While counties may be liable for single acts or decisions of a

county officer with final policy making power, counties may not be

held liable for independent actions of county employees under the

theory of *respondeat superior. Id.* (citing cases). To determine

whether an actor or county, in this case the sheriff, his deputies

and Shelby County, exercise final policy making authority by which

the county can be held liable pursuant to § 1983, the court must

look to state law. *Id.*

For the reasons set forth in *McMillian v. Johnson* this court

holds that Shelby County, pursuant to Alabama state law, has no

final policy making authority in either the areas of law

enforcement or mental health regulation, insofar as said regulation

relates to community mental health officers. The court holds the

15

latter view because there is no evidence that Shelby County has adopted Alabama Code §§ 22-52-90 through 22-52-93.  These sections might, if adopted, confer such authority on Shelby County.[6] Furthermore, the court notes that Shelby County "has no authority over, and takes no part in, the training or supervising of deputy sheriffs in Shelby County." *Crocker v. Shelby County*, 604 So. 2d 350, 350 (Ala. 1992) (citing cases).  For these reasons all claims against Shelby County, including the claim alleging inadequate training of the deputies, are due to be dismissed and defendants' motion for summary judgment is due to be granted.

### 3. Remaining Claims

Interestingly, plaintiff does not respond to any of defendants' other arguments in their motion for summary judgment. Significantly, they do not contest that defendant, Sheriff James Jones ("Jones"), is not liable for negligent training, or for any of plaintiff's other claims.  Furthermore, plaintiff offers no

---

[6]Alabama Code § 22-52-92 (1996) specifically states that the article relating to policies governing community mental health officers:

> [S]hall not be applicable to any county unless and until the judge of probate with the approval of the county commission of the that particular county makes a finding that there exists in the county provisions for implementation of the community mental health officer program and the necessary facilities to detain persons pursuant to this article.

The evidence is wholly to the contrary.  Probate Judge Patricia Fuhrmeister, in an affidavit, represented that she has never taken steps to implement this statute. Plaintiffs have offered no evidence that the statute was ever implemented.

16

evidence to show that he would be so liable.  Accordingly, the action as against Jones is due to be dismissed.  Nor does the plaintiff dispute that Jones, Walters, Chapman, Lawley and Chamblee are entitled to Eleventh Amendment immunity for any actions taken in their official capacities.  Because plaintiff sought no injunction, and because she is barred from suing Jones, Walters, Chapman, Lawley and Chamblee in their official capacities for any retroactive damages, defendants' motion for summary judgment as to these defendants in their official capacities is due to be granted. *See Parker*, 862 F.2d at 1475-76.

### D. Conclusion

For the foregoing reasons defendants' motion for summary judgment is due to be granted. Deceased's death was tragic. It was apparently the product of alcohol, depression, and related poor judgment by deceased.  It was not, however, due to constitutionally inappropriate behavior by defendants.  Plaintiff might or might not have a state law negligence claim against Walters over which this court would have no jurisdiction.

A separate and appropriate order will be entered.

DONE this ___27th___ day of February, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT

17